# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERICA LYNN MARIE HEWITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | Case No. 12 C 0607 |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Claimant Erica Lynn Marie Hewitt brings this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying her claim for a period of disability insurance benefits. Hewitt asks the court to reverse the Commissioner's decision and remand the case to the Social Security Administration ("the SSA"). For the reasons stated below, Hewitt's motion is granted, and the decision of the Commission is reversed and remanded to the SSA for further proceedings consistent with this opinion.

### I. PROCEDURAL HISTORY

Hewitt filed a claim for a period of disability and disability insurance benefits under Title II of the Social Security Act on May 19, 2009, along with a companion claim for SSI benefits under Title XVI. She alleges a disability onset date of February 28, 2006, when she was hospitalized in a coma after accidentally ingesting diabetes medication. Hewitt's claims were initially denied by the SSA on January 22, 2010. After a hearing held on May 24, 2011, Administrative Law Judge Roxanne Kelsey ("the ALJ") denied Hewitt benefits on June 8, 2011.

The Appeals Council denied Hewitt's request for review of the ALJ's decision on November 29, 2011. Hewitt filed a complaint with this court on January 27, 2012.

In support of her motion for summary judgment, Hewitt raises the following arguments:

1. The ALJ committed reversible error by finding that Hewitt's mental disorders did not meet the requirements of Listing 12.02 (Organic Mental Disorders), which would have required a finding of disability.

2. The ALJ erred in failing to accord substantial weight to the opinion of Hewitt's examining psychologist, Dr. John Spores.

3. The ALJ erred in failing to accord substantial weight to the opinion of Hewitt's treating psychiatrist, Dr. Samir Gupta.

## II. Factual Background[1]

### A. Hearing Testimony

Hewitt testified at a hearing before the ALJ on May 24, 2011. Hewitt appeared at the Social Security office in Valparaiso, Indiana, and the ALJ presided over the hearing from Orland Park, Illinois. Hewitt testified that she graduated from high school and had completed some college coursework. She planned to take additional classes at a community college. (R. 807.) Since allegedly becoming disabled in 2006, she had worked at two jobs. She was laid off from one job and fired from the other. (R. 809-10.) She explained that she was fired from a job at McDonalds because she violated company regulations by using a manager's passcode for the cash register. (R. 810.) She testified that she "didn't even remember that it was a rule" that she was not allowed to use the passcode. (R. 811.)

Hewitt testified that in 2006, she went into a diabetic coma as a result of taking the wrong medication. (R. 811.) She stated that her memory, anxiety, and anger problems kept her from

---

[1]      All cites to record evidence (R. __.) are to the Certified Administrative Record. Much of the record pertains to treatment of Hewitt's physical problems; the discussion here is limited to the evidence relevant to her mental disorder, as she has not challenged the ALJ's determinations as to her physical ailments.

working. She had two children, ages three and eleven. She helped take care of the younger child, who lived with her. (R. 812.) She attended parent-teacher events at the older child's school. (R. 813.)

Hewitt testified that she had to be careful when roughhousing with her older son because "the anger starts coming out." (R. 816.) She stated that the medication she was taking for her mental problems was helping "[a] little bit." She explained that her dosage of Xanax had been increased because she had been "shaking a lot" and "having a lot more panic attacks." She also reported having trouble sleeping and was taking sleeping medication. She reported having panic attacks "at least twice a week," usually lasting about fifteen minutes. (R. 817.)

Hewitt further testified that she did laundry, but would "get a little sidetracked" and "just forget all about" the clothes, sometimes leaving them in the washer for days. (R. 819.) Her husband had to remind her of things. Her husband cooked, and they did the grocery shopping together, because "even with the list" she would "still forget stuff." (R. 819.) She read murder mysteries. (R. 820.) She reported disliking being around people. (R. 820.) She was able to interact well with her children's teachers. While working at McDonalds, she was never rude to a customer, but had "some issues with coworkers." (R. 821.) She snapped at her boss when he yelled at her. (R. 822.) She was able to work an eight-hour shift at McDonalds. (R. 823.) She was able to remember to take her medication most of the time, but sometimes needed her husband to remind her. She set her cell phone to remind her of doctor's appointments. (R. 823.)

Vocational Expert Pamela Tucker ("the VE") testified that Hewitt's past work history would be classified as a warehouse checker (light, unskilled) and as a stock control clerk (light, semi-skilled). She testified that a younger individual with more than a high school education who could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could sit,

stand, or walk for about six hours each in an eight-hour workday; could occasionally climb ladders, ropes or scaffolds and could occasionally crawl; who was limited to superficial and casual encounters with coworkers, supervisors, and the general public; and who was limited in her ability to concentrate such that she was only able to understand, remember, and carry out simple tasks, would be able to perform Hewitt's past work as a warehouse checker. (R. 826.) Such an individual could also perform work as a laundry worker, cleaner, or packer, all of which are medium, unskilled jobs available in the state of Indiana. (R. 826-27.)

The ALJ stated during the hearing that, for the purposes of determining the jobs available for a person with Hewitt's residual functional capacity, she would not ask "a hypothetical based on [a Medical Source Statement prepared by Dr. Samir Gupta on March 17, 2011,] because the number of marked limitations [listed in the statement] would have the claimant . . . meeting a listing if I were to give that full weight. . . . Of course, I don't know what weight I will be giving to that document yet." (R. 827.)

In answer to a question posed by Hewitt's counsel, the VE stated that were an individual unable twenty percent or more of the time to make judgments on simple work-related decisions; understand and remember complex instructions; carry out complex instructions; make judgments on complex instructions; interact appropriately with the public, supervisors, or coworkers; or respond to usual work situations and changes; she would not be able to perform Hewitt's past work or any other work in the national economy. (R. 828.)

## B. Medical and Documentary Evidence

Hewitt was involved in a car accident on April 18, 2005, during which she suffered multiple blunt trauma. (R. 780.) She had extensive surgery and was hospitalized for several weeks, with follow-up visits over several subsequent months. (R. 793.)

1. Porter Hospital Records

Hospital records from approximately a year after the coma, dated March 30, 2006, prescribed speech-language therapy and indicated that Hewitt reported trouble with her memory and with completion of daily activities. (R. 402.)

2. Dr. Walsh

Hewitt was assessed by Dr. Robert Walsh on June 20, 2006, and September 1, 2006. A number of tests were administered. Hewitt reported shaking, difficulty concentrating, anger issues, and short-term memory problems. (R. 190.) Results of the Wechsler Memory Scale indicated that her memory function was within normal limits, while other tests indicated deficits in processing speed, judgment, and attention to detail, as well as in auditory attention and concentration. (R. 194.) Dr. Walsh concluded that Hewitt was "showing significant personality deterioration, especially when frustrated or under stress." Dr. Walsh recommended medication as well as individual outpatient therapy. (R. 195.)

3. Dr. Nordstrom

Dr. Craig Nordstrom evaluated Hewitt on January 2, 2008, in his capacity as a contractor for Disability Determination Services ("DDS"). Dr. Nordstrom noted that Hewitt had been diagnosed with major depression and reported memory impairment and personality changes. (R. 196.) Hewitt reported that she had difficulty concentrating and got angry easily. (R. 198.) Dr. Nordstrom stated that his diagnostic impressions included a mild cognitive disorder. (*Id.*) Nordstrom examined Hewitt again on November 18, 2009. He reviewed Dr. Walsh's neuropsychological evaluation from September 2006, which showed average to above-average scores on the Wechsler Memory Scale. (R. 337.) Hewitt reported difficulty with memory and frequent panic attacks, insomnia, and poor concentration. (R. 338.) She was not able to

remember a series of three words after five minutes. (R. 339.) She reported not remembering to shower. Dr. Nordstrom's report stated that his diagnostic impressions included panic without agoraphobia, depressive disorder, and histrionic personality traits. (R. 340.)

4. Behavioral Therapist Consultation

Notes by Licensed Clinical Social Worker Jennifer Noonan indicated that Hewitt was seen at NorthShore Health Centers about her anxiety disorder on January 13, 2009. Hewitt reported irritability, difficulty sleeping, poor memory, and panic attacks. (R. 297.) On patient questionnaires, she reported that it was "somewhat difficult" to do her work and get along with other people. (R. 298.) She reporting being so irritable that she shouted and fought with others, but stated (on two different questionnaires) that this caused a "minor" or "moderate" problem. (R. 299, 305.) She also reported frequent anxiety and irritability that made it "very difficult" to do work, take care of things at home, and get along with other people. (R. 300.)

5. Dr. Johnson (Mental Residual Functional Capacity Assessment and Psychiatric Review Technique Form)

A Mental Residual Functional Capacity Assessment completed on January 22, 2010, by DDS consultant Dr. Amy Johnson stated that Hewitt was "moderately limited" in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to accept instructions and respond appropriately to criticism from supervisors. (R. 624-25.) At the time of the assessment, Hewitt was not currently receiving psychiatric treatment or psychotherapy services. (R. 626.) Dr. Johnson stated that Hewitt's functioning suggested that she could "perform a wide range of activities," including taking care of her personal hygiene, doing housework, shopping, reading, making simple meals, caring for her younger son, and socializing. Dr. Johnson concluded that while Hewitt's reports of her symptoms were credible, the level of severity Hewitt alleged was only partially credible, and that Hewitt could manage simple tasks

and the "stresses involved with at least simple work." Dr. Johnson's assessment was based on a rehabilitation report from July 2008, the testing conducted in June and September 2006 by Dr. Walsh, Dr. Nordstrom's evaluation of January 2008, and Hewitt's work records. (R. 626-27.)

On a Psychiatric Review Technique Form, also completed on January 22, 2010, Dr. Johnson rated Hewitt's functional limitations as "mild" with respect to restriction of activities of daily living, and "moderate" with respect to difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (R. 638.)

6. Dr. Gupta (2009-10 Treatment Notes)

Psychiatrist Dr. Samir Gupta first evaluated Hewitt on December 21, 2009. During a thirty-minute initial evaluation, Hewitt reported worsening depressive symptoms, anxiety, and suicidal ideation. She also self-reported irritability, trouble sleeping, and panic attacks, for which Xanax was "partially helpful." (R. 621.) She indicated that her symptoms of depression had worsened in the past year and that she was experiencing mood swings. She reported a good relationship with her husband. (R. 622.) The immediate treatment plan was a trial of Lexapro, continuation of Xanax, and Trazodone for insomnia, with a follow-up visit in four to six weeks. (R. 622.)

Dr. Gupta saw Hewitt again on January 19, 2010, for a fifteen-minute appointment. Hewitt reported ongoing difficulties with depression, sleep, and anxiety. Her medications were adjusted. (R. 675.) She returned to see Dr. Gupta on June 15, 2010. She was confronted about her failure to pursue treatment for almost six months and reported a lack of insurance coverage. Medications, which Hewitt had not been taking because of a lack of insurance, were renewed. (R. 678.) At a follow-up appointment on June 29, 2010, Dr. Gupta noted that Hewitt appeared

"significantly anxious." Her medications were continued. (R. 680.) The record includes no further treatment notes by Dr. Gupta.

7. <u>Porter-Starke Services (Stephanie Martin)</u>

Hewitt was referred by Dr. Gupta for therapy at Porter-Starke Services in 2010. At an appointment on July 8, 2010, a psycho-social assessment was completed by Stephanie Martin. Hewitt reported feeling "extreme" anger toward her neighbor, with whom she had been fighting for several months, but stated that she would not act on her violent ideations toward the neighbor. She further reported a history of depression, short-term memory loss resulting from the coma, and anxiety. She stated that she had suffered suicidal ideations in December 2009, which led her to seek treatment from Dr. Gupta. (R. 682.) She stated that her living situation was volatile, but that her relationship with her husband was good, and she denied any interpersonal relationship problems apart from those with her neighbor. (R. 683.) Conclusions from a mental status exam were that her thought process was logical, her memory and judgment intact, and her reasoning normal. (R. 683-84.) She was prescribed bi-weekly therapy with a clinician. (R. 684.) Appointment notes dated July 29, 2010, and August 5, 2010, stated that Hewitt was worried and anxious after the death of her son's father, and that she was still angry toward her neighbor. (R. 686.) Ms. Martin attempted to assist Hewitt in processing her feelings, although the treatment notes suggest that little progress was made on this goal during the two appointments. (R. 687.) The record includes no other treatment notes from Ms. Martin.

8. <u>Porter-Starke Services (Dr. Spores)</u>

Dr. John Spores of Porter-Starke Services completed a neuropsychological evaluation report on March 15, 2011, after Dr. Gupta referred Hewitt to him. Hewitt was not taking medications at the time. Under "referral information," the report stated that "Dr. Gupta indicated

that the diagnosis remains ambiguous subsequent to clinical interview and observations." The working diagnoses were generalized anxiety disorder and major depressive disorder. The presenting symptoms were impairments in immediate and intermediate memory, increasing difficulties in attention and concentration, and some deficits in longer-term memory. (R. 692.) Results from a Mental Status Examination, including a Mini-Mental State Examination, indicated deficiencies in recall and comprehension. Dr. Spores stated that the tests shows "mild cognitive impairment" and mild impairment of immediate and intermediate memory functions. (R. 693.) Results from a Neuropsychological Assessment Battery ("NAB"), Form 1, indicated moderate impairment in attention, mild-to-moderate impairment in language, and severe impairment in memory. (R. 694.) Dr. Spores summarized that "the minimum criteria for a dementia have been met, including measured impairment in memory and language or aphasia." (R. 695.) Results from an NAB Daily Living Skills indicated severe impairment of memory. (*Id.*) Dr. Spores summarized that "the majority of daily living skills subtests showed evidence of impairment, largely involving memory, attention, and language." (R. 696.) Based on the results of a Millon Clinical Multiaxial Inventory—III test ("MCMI—III"), Dr. Spores concluded, "the results are positive for an agitated and severe depressive disorder associated with neuropsychological dysfunction." (R. 697.) Personality patterns included "severe borderline traits, and secondary paranoid features." (R. 698.) Post-test DSM-IV-TR diagnoses were "Dementia Due to Head Trauma and Coma, with Behavior Disturbance, Mild-to-Moderate Severity, Likely Non-Progressive;" "Mood Disorder Due to Head Trauma and Coma, with Depressive Features and Agitation;" and "Personality Change Due to Head Trauma and Coma, With Borderline Traits and Paranoid Features." Hewitt's Global Assessment of Functioning score was 45—a score indicating "serious" symptoms. (R. 698.)

9. Dr. Gupta (2011 Medical Source Statement)

On March 17, 2011, Dr. Gupta completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form, in connection with Hewitt's application for disability benefits. He indicated that she had moderate restrictions in her ability to carry out simple instructions, and marked restrictions in her ability to make judgments on simple work-related decisions, to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. (R. 799.) He stated that Hewitt had marked restrictions in her ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work settings and to changes in a routine work setting. (R. 800.) Dr. Gupta indicated that Hewitt also had mood swings and personality changes due to head trauma. Under "functional limitations," Dr. Gupta indicated that Hewitt had marked limitations in maintaining social functioning and in maintaining concentration, persistence, and pace; and that she had suffered four or more episodes of decompensation of extended duration. (R. 802.) Dr. Gupta stated that Hewitt needed ongoing treatment and was currently unable to work. (*Id.*) In the spaces on the form that requested supportive medical findings or pertinent clinical notes or test results, Dr. Gupta wrote, "[p]lease refer to psychological testing." (R. 799-800.) His other written notes stated that Hewitt had mood changes and personality changes secondary to head trauma and diabetic coma. (R. 802.)

10. Work Records

A questionnaire completed by RMC Enterprises LLC stated that Hewitt worked as a McDonald's crew member from May 16, 2008, to December 3, 2008. It further stated that she had "no problems" with attendance, maintaining a work routine, concentrating on assigned work, or getting along with others, and that she was fired for violating company policy. (R. 165-67.)

A questionnaire completed by a Sedona Group branch manager stated that Hewitt worked on a temporary basis as a general warehouse worker from December 12, 2008, to January 14, 2009. (R. 159.) The questionnaire stated that the staffing company did not work directly with Hewitt, but that the client gave her good feedback and "would have kept her working if they hadn't slowed down." (R. 161.)

## C. The ALJ's decision

Determining whether an individual is disabled requires the ALJ to undertake a five-step sequential evaluation process. 20 C.F.R. 404.1520(a). The ALJ must determine 1) whether the claimant is engaging in substantial gainful activity, 2) whether the claimant has a medically determinable impairment or combination of impairments that is "severe," 3) whether the impairment meets or medically equals the criteria of an impairment listed in the regulations (if so, the claimant is disabled), 4) whether the claimant has the residual functional capacity to perform his past relevant work, and 5) whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. *Id.*; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The SSA bears the burden of providing evidence that work exists in the national economy that the claimant can do. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

In this case, the ALJ determined at steps one and two that Hewitt had not engaged in substantial gainful activity since the alleged disability onset date of February 28, 2006, and that she had severe impairments due to affective disorder, anxiety-related disorder with panic attacks, and degenerative disc disease. The ALJ concluded that Hewitt's alleged schizophrenia was not a severe impairment. (R. 22.) At step three, the ALJ determined that Hewitt's physical impairments did not meet or medically equal one of the impairments listed in the regulations,

specifically in Listings 1.04, and 1.02A, which involve musculoskeletal impairments. (R. 23.) The ALJ further concluded that Hewitt's mental impairments did not equal the criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-related Disorders), because the restrictions and difficulties resulting from her mental impairments were not marked, as required to meet the listing, but rather mild with regard to activities of daily living, moderate with regard to social functioning, and moderate with regard to Hewitt's ability to maintain concentration, persistence, or pace. (*Id.*) In so concluding, the ALJ gave "great weight to the State agency psychologist's Psychiatric Review Technique Form," which was completed by Dr. Johnson in January 2010. (*Id.*) She also noted that Hewitt could complete "a range of daily activities," that "there was inconsistent testimony regarding her ability to get along with others," and that she could "follow spoken instructions if they are not too complex." (R. 23-24.)

The ALJ next determined that Hewitt's residual functional capacity was to lift and/or carry 50 pounds occasionally and 25 pounds frequently; to sit, stand, or walk for about six hours each in an eight hour workday; to occasionally climb ladders, ropes, and scaffolds and crawl; to have superficial and casual encounters with co-workers, supervisors, and the general public; and to understand, remember, and carry out simple tasks. (R. 24.) At step four, the ALJ concluded that Hewitt was capable of performing her past relevant work as a warehouse checker. (R. 32.) The ALJ therefore concluded that Hewitt was not disabled.

### III. STANDARD OF REVIEW

A claimant is entitled to disability benefits if he can prove he is "under a disability," meaning he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A). The impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques;" without medical evidence, the ALJ will not consider an individual to have a disability. *Id.* §§ 423(d)(3), (5).

At the federal district court level, the Social Security Act permits claimants to argue that the factual determinations made by the ALJ who decided the case are not supported by "substantial evidence." 42 U.S.C. § 405(g). The district court must review the administrative record to determine whether there was a reasonable factual basis for the denial of benefits. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The court cannot decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Id.* Although the ALJ is not required to mention every piece of evidence, the ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that the court "may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Id.* at 1002.

## IV. ANALYSIS

### A. Listing 12.02

Hewitt first argues that the record demonstrated that her condition met the requirements of Listing 12.02 (Organic Mental Disorders) and therefore required a finding of disability. The ALJ found, at step three of the sequential evaluation process, that Hewitt's mental impairments did not meet the requirements of a listing.

The listing for Organic Mental Disorders requires, in relevant part:

A.      Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1.      Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing . . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

At step three, the ALJ did not specifically mention Listing 12.02; she instead referred to Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-related Disorders). The ALJ therefore did not specifically discuss the criteria in Listing 12.02(A). Reviewing the record, the court concludes that Hewitt satisfied the 12.02(A) criteria: the evidence shows that she experienced memory impairment and emotional lability.

The ALJ did specifically consider whether the criteria in 12.02(B) were satisfied, however. The "B criteria" in Listing 12.02 are identical to the criteria set out in 12.04(B) and 12.06(B): the claimant must have a "marked" restriction in two of four areas. The ALJ

concluded that although Hewitt was mildly to moderately limited in the areas listed in the B criteria, her mental impairments did not result in the significant functional limitations contemplated by the criteria. The judge stated that she gave "great weight" to Dr. Johnson's Psychiatric Review Technique Form, completed on January 22, 2010. She concluded that Hewitt had mild restrictions with respect to the first criterion, activities of daily living, noting that Hewitt could perform a range of daily activities. With regard to the second B criterion, social functioning, the ALJ concluded that Hewitt had moderate restrictions. Although Hewitt reported extreme anger toward her neighbor, she had friends and spent time with others. The ALJ noted some "inconsistent testimony" regarding Hewitt's ability to get along with others. (R. 23.) Finally, as to the third criterion, concentration, persistence, or pace, the ALJ concluded that Hewitt had moderate restrictions. She acknowledged that Hewitt had trouble concentrating and was confused by written instructions, but noted that she could follow simple spoken instructions.

Hewitt claims that the evaluations conducted by Dr. Walsh in 2006 and Dr. Spores in 2011 show that her functioning was markedly impaired with respect to each of the first three B criteria, and that the ALJ should not have relied on Dr. Johnson's report, completed in January 2010, because it was made without the benefit of Dr. Spore's findings.

The court concludes that there is evidence in the record suggesting a marked restriction in three of the four B criteria, and that the ALJ's opinion does not adequately analyze that evidence and build the required "logical bridge" between the evidence in the record and the conclusion that Hewitt's restrictions were only mild or moderate. *See Roddy*, 705 F.3d at 636. First, as to activities of daily living, the testimony and evidence suggested that Hewitt could complete various daily activities, but that she required assistance to do so. Hewitt testified that she did laundry, but would "get a little sidetracked" and "just forget all about" the clothes, sometimes

leaving them in the washer for days. Her husband cooked, and he did the grocery shopping with her. She needed her husband to remind her to take her medication and complete other activities. Dr. Spores's test results also indicated that Hewitt suffered impairment in "[t]he majority of daily living skills subtests." (R. 696.) In summary, the record indicates that Hewitt struggled to perform simple household chores.

Although the ALJ stated Hewitt could complete "a range of daily activities," the ALJ did not consider the significant limitations on Hewitt's ability to do so. The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy*, 705 F.3d at 639. On remand, the ALJ should consider the assistance Hewitt requires to perform daily activities, and whether this supports the conclusion that her restriction is only mild, rather than moderate or marked. *See Craft*, 539 F.3d at 680.

As to restrictions in social functioning, the ALJ concluded that Hewitt had moderate restrictions, apparently based on "inconsistent testimony" regarding Hewitt's ability to get along with others. (*See* R. 23.) The ALJ noted that Hewitt got along with her husband and had friends. This, however, does not directly contradict Hewitt's additional testimony that she got "very angry very, very, very quickly." (R. 812.) Having friends is not inconsistent with having difficulties with social relationships. Furthermore, the ALJ did not address any of the medical evidence regarding Hewitt's personality disorder and lack of anger control. Dr. Walsh concluded in 2006 that Hewitt was "showing significant personality deterioration, especially when frustrated or under stress." (R. 195.) Dr. Walsh further stated that "[t]he development of a personality disorder with some antisocial features is prominent," and that Hewitt's slow processing of information might lead to "poor anger control." (*Id.*) Dr. Spores's 2011 test

results indicated an anxiety disorder and borderline personality disorder (R. 697), which further suggests that Hewitt's might suffer severe limitations in her interpersonal relationships. The ALJ's opinion did not address this possibility.

As to concentration, persistence, and pace, the ALJ referred only to the fact that Hewitt "can follow spoken instructions if they are not too complex" in concluding that Hewitt suffered "only a moderate limitation in this domain." (R. 24.) But the record is replete with evidence showing that Hewitt was significantly limited with respect to this criterion, and the ALJ addressed little of this evidence in reaching her conclusion. Results of the Wechsler Memory Scale test conducted by Dr. Walsh in 2006 indicated that Hewitt had deficits in processing speed, judgment and attention to detail, and in auditory attention and concentration. Results from the tests administered by Dr. Spores showed severe memory impairment. Moreover, as the ALJ acknowledged, Hewitt's husband reported that she was confused by written instructions and could pay attention for only twenty minutes at a time.

"An ALJ must consider all medical opinions in the record." *Roddy*, 705 F.3d at 636 (citing 20 C.F.R. §§ 404.1527(b), (c); *Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995)). Moreover, although the ALJ need not address all the evidence in the record in her opinion, she must at least explain why some evidence is credited over other evidence. *Id.* Because the ALJ's opinion neglects to address much of the relevant evidence in the record, it does not sufficiently explain why Hewitt's impairment is not of listing level severity so as to require a finding of disability. The court remands Hewitt's case to the SSA so that the ALJ may explain her finding that Hewitt's impairment did not meet Listing 12.02.

## B. Opinions of the Examining Psychologist and Treating Psychiatrist

Hewitt also argues that the ALJ should have afforded controlling weight to the opinion of Dr. Spores, and to Dr. Gupta's treatment notes, and that the ALJ improperly disregarded the conclusions made by Dr. Gupta in the Medical Source Statement he completed in March 2011. As the ALJ acknowledged during the hearing, Dr. Gupta's Medical Source Statement, if credited, would have compelled a finding that Hewitt was disabled.

As stated above, an ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(b); *see Young*, 362 F.3d at 1001 ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The ALJ should consider the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. §§ 404.1527(c)(1)-(6). The ALJ must clearly state the weight given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1006 (N.D. Ill. 2008). Furthermore, an ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(b)(2); see also *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

The ALJ gave the March 2011 Medical Source Statement completed by Dr. Gupta "little weight," finding that it was inconsistent with the medical records. (R. 32.) Hewitt argues that Dr. Gupta's report should have been afforded significant, if not controlling weight. She further argues that her condition was degenerative, and that the ALJ should not have disregarded Dr. Gupta's most recent evaluation, conducted only a month before her hearing before the ALJ, based on other treatment notes that were a year old.

An ALJ is entitled to accord less weight to the conclusions of medical sources to the extent that they are inconsistent with other evidence. 20 C.F.R. § 404.1527(c)(4). But although the ALJ was not required to give Dr. Gupta's opinion controlling weight if it was undermined by the rest of the record, she "was required to provide a sound explanation" for rejecting it. *Roddy*, 705 F.3d at 636. Here, the court finds no error in the ALJ's treatment of Dr. Gupta's conclusions. There were no patient notes that were contemporaneous with Dr. Gupta's March 2011 evaluation, and there was no indication that Dr. Gupta had been treating Hewitt in the months leading up to the March 2011 evaluation. The record suggests that Hewitt did not see Dr. Gupta between July 29, 2010, and March 17, 2011, and did not see Stephanie Martin after August 2010. This demonstrates that Dr. Gupta did not have a close doctor-patient relationship with Hewitt. The ALJ was entitled to give less weight to a treating source who had not seen Hewitt with sufficient frequency over sufficient time "to have obtained a longitudinal picture of [her] impairment." 20 C.F.R. § 404.1527(c)(2)(i). Furthermore, in the Medical Source Statement, Dr. Gupta did not provide a detailed basis for his conclusions or refer to Hewitt's treatment notes and tests with any specificity. For example, although he stated that Hewitt had episodes of decompensation, there is no documentation of hospital admissions or treatment to support that statement. It is also not clear from Dr. Gupta's notes how he came to the conclusion that Hewitt suffered "marked" restrictions in the B criteria. He wrote, "[p]lease refer to psychological testing." (R. 799-800.) His other written notes stated only that Hewitt had mood changes and personality changes secondary to head trauma and diabetic coma. (R. 802.) "The better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(c)(3). The court concludes that the ALJ was entitled to give Dr. Gupta's opinion little weight because his conclusions were largely unsupported by treatment

notes or analysis and added virtually nothing to the conclusions of Dr. Spores. Moreover, to the extent that Dr. Gupta opined on whether Hewitt was able to work or met the statutory definition of disability, those determinations are reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d).

As to the findings of Dr. Spores, however, the court finds no basis for the ALJ's decision to afford those conclusions little weight. The ALJ discussed the results of the exam conducted by Dr. Spores on March 15, 2011, noting that the battery of tests indicated "mild cognitive impairment," mild to moderate impairment in overall neuropsychological functioning, severe impairment in memory functioning, and moderate impairment in neurocognitive ability and attention. (R. 27.) The ALJ then dismissed these results by stating that they were inconsistent with Hewitt's treatment records. (R. 29.) The ALJ also noted that Dr. Spores's evaluation was "apparently purchased by counsel." (*Id*.)

Results from the tests administered by Dr. Spores in March 2011 were mixed, with some suggesting "mild cognitive impairment" and mild impairment of memory, and others showing severe memory impairment. The court does not agree with the ALJ that Dr. Spores's test results were inconsistent with Hewitt's other medical records: records dating back to 2006 had shown evidence of memory and cognitive impairments. Moreover, Hewitt had no treatment notes that were contemporaneous with the March 2011 evaluation. The ALJ did not explain what inference, if any, should be drawn from Hewitt's gaps in treatment, which could have been due to a lack of medical insurance, to Hewitt's inability to cope with activities of daily living, or to some improvement in Hewitt's condition. Furthermore, nothing indicates that Dr. Spores's tests did not rely on "medically acceptable . . . diagnostic techniques." *Punzio*, 630 F.3d at 712. In addition, "the fact that relevant evidence has been solicited by the claimant or her representative

is not a sufficient justification to belittle or ignore that evidence." *Id*.  The relevant question is "whether the treating source's opinion is both well supported by medically acceptable diagnostic techniques and consistent with the other evidence in the record." *Id.* at 713.  The court concludes that the ALJ erred in giving little weight to Dr. Spores's conclusions.

## V. CONCLUSION

Hewitt has shown that the ALJ failed to adequately conduct the required five-step analysis in determining whether she was disabled.  The Commissioner's decision is reversed, and Hewitt's motion to the remand the case to the SSA for further proceedings is granted.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  March 15, 2013